### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 23-CR-286 (RBW)** |
| **SAEVE EVANS,** | |
| **Defendant.** | |

### GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

      The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits its Memorandum in Aid of Sentencing.  Mr. Evans is before the Court after pleading guilty to a brazen and unprovoked shooting on August 1, 2023, where he first fired his gun into the air after yelling at a civilian simply walking past him, and then fired every round in his weapon -- fourteen (14) rounds total in three (3) separate volleys -- at a Metropolitan Police Department officer (hereinafter, "Officer E.D.") who had done nothing more than drive up to the area to investigate the first shooting.  For the reasons stated herein, the United States requests this Court sentence Mr. Saeve Evans on Count One (Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by a Term of Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. § 922(g)(1)) to a period of one hundred and thirty-five (135) months of incarceration followed by five (5) years of supervised release, and Count Four (Assaulting a Police Officer While Armed, in violation of 22 D.C. Code §§ 405(c), 4502) to a period of eighty-four (84) months of incarceration followed by five (5) years of supervised release, to run concurrent with Count One.

### FACTUAL BACKGROUND

      The shooting committed by Mr. Evans occurred on August 1, 2023, at around 5:20 a.m. at

1711 Benning Road, Northeast, a three-story apartment building in Northeast, Washington D.C., featuring an interior courtyard area (hereinafter, "1711 Benning"). As outlined below, the entire ordeal began when Mr. Evans began yelling at an unknown individual who did nothing more to provoke him than walk by while Mr. Evans was walking his dog. Mr. Evans then escalated his frightening behavior by firing three shots while yelling at that unknown individual. This unprompted frightening display by Mr. Evans led to the police being called to investigate – which resulted in Mr. Evans indiscriminately unloading his weapon at that officer in a residential area with zero regard either for the life of the officer or those living in the area.

Several apartment surveillance cameras have been submitted to Chambers and Mr. Evans, which captures the entire incident. The arrows in the map below show the approximate locations and directions where each surveillance camera faces:



- Surveillance capturing the courtyard facing Gales Place Northeast (hereinafter, the "Courtyard") has been submitted as <u>Exhibit 1</u>;

- Surveillance capturing the parking lot facing Gales Place Northeast have been submitted as <u>Exhibits 2A</u>, and <u>2B</u>;

- Surveillance capturing the walkway facing Benning Road Northeast (hereinafter, the "Walkway") has been submitted as <u>Exhibit 3</u>;

- Surveillance from within the stairwell of 1711 Benning has been submitted as <u>Exhibit 4</u>;

- Surveillance capturing the Courtyard facing towards the entrance of 1711 Benning has been submitted as <u>Exhibit 5</u>; and

- Ring camera from an apartment located on Gales Place Northeast facing 1711 Benning has been submitted as <u>Exhibit 6</u>.  Only <u>Exhibit 6</u> contains audio.

As captured by the video surveillance, at around 5:20 a.m., Mr. Evans is seen exiting 1711 Benning wearing a black t-shirt, blue jeans, and a black/white scarf. He spends the next several minutes walking his dog in between the Courtyard and the Walkway.  Despite the early hours of the morning, individuals are walking on the sidewalk and cars are driving by.  *See, e.g.*, Ex. 3 at :00 - :50.

At approximately 5:25 a.m., an unidentified individual walks through the Courtyard wearing tan pants, a dark shirt, and a backpack (hereinafter, "Unidentified Individual").  Ex. 1 at :00 - :21.  As the Unidentified Individual is doing so, Mr. Evans walks towards the Courtyard from the Walkway while talking on his cell phone. Ex. 3 at 1:40 – 2:02.  When Mr. Evans rounds the corner towards the Walkway, he produces a firearm from his back pocket and fires one shot.  *Id.* at 2:05 – 2:10. Although Mr. Evans is out of the camera's view initially, his shadow is seen in the Walkway and suggests that his right arm is outstretched and pointed forward consistent with a

shooting position, (*id.* at 2:07 – 2:10); he then enters the camera's view with his right arm still raised in a shooting position, as shown in the still below from Exhibit 3.



The Unidentified Individual, who is now in the parking lot moving towards Gales Place Northeast, appears to hear the shot, as immediately he ducks, as shown in the still from Exhibit 2A below, and begins to run down Gales Place Northeast.  Ex. 2A at :00 - :28; Ex. 1 at :25 - :37.



Mr. Evans retreats briefly into the Walkway before speaking into his cell phone and firing another shot in the air, as shown in the still from Exhibit 3 below. Ex. 3 at 2:05 – 2:25.



As the Unidentified Individual runs past the apartments on Gales Place Northeast, a Ring camera captures Mr. Evans yelling "Huh!? Ya'll think I'm playing!?" Ex. 6 at :00 - :05; Ex. 3 at 2:20 – 2:23. Importantly, at no point does the Unidentified Individual ever appear to do anything even remotely threatening – indeed, he never even engages with Mr. Evans either before or after Mr. Evans shot his weapon.

Mr. Evans then moves into the Courtyard and fires a third shot in the air, as captured in the still from Exhibit 1 below. Ex. 1 at :49 - :55.



Mr. Evans continues to pace through the Courtyard and back into the Walkway, appearing increasingly agitated. Ex. 1 at :55 – 1:35; Ex. 3 at 3:15 – 3:35. As Mr. Evans enters the Walkway, he tears his black t-shirt in half. Ex. 3 at 3:35 – 3:45. When he spots a second unidentified individual walking on the Benning Road sidewalk, he grabs his gun from his waistband, as captured in the stills below from Exhibit 3, and begins yelling at this person while stalking them up the sidewalk. *Id.* at 3:45 – 4:15.

 

Around this time, a Metropolitan Police Department ("MPD") cruiser with its emergency lights on drives by Mr. Evans on Benning Road Northeast.  Mr. Evans appears to notice the cruiser and wraps his firearm in the tattered remains of his black t-shirt. *Id.* at 4:20 – 4:25. He then raises his right hand to salute the cruiser as it passes by, as shown in the stills from Exhibit 3 below. *Id.* at 4:23 – 4:57. He continues to scream, and eventually makes his way back to the Courtyard. *Id.*



Immediately after Mr. Evans fired his first three (3) shots, ShotSpotter[1] notified MPD.

---

[1] ShotSpotter is gunshot detection, acoustic surveillance technology that uses sensors to detect,

MPD Officer E.D., who was stationed nearby in his uniform and marked-MPD cruiser in a single-officer capacity, responded to the call.[2] At 5:28 a.m., Officer E.D. arrived on Gales Place Northeast in front of 1711 Benning and began to walk along the sidewalk looking for shell casings.  Ex. 7 at 1:55 – 2:10; Ex. 2B :09 - :27.  Officer E.D. spotted Mr. Evans standing in the Courtyard area, and Mr. Evans began yelling at Officer E.D. something to the effect of: "I already know what you're here for! Come and get it!"[3] In response, Officer E.D. yelled to Mr. Evans, "hey! Let me see your hands!" Ex. 7 at 2:10 – 2:17. Mr. Evans pauses for a moment and begins to run towards the entrance of 1711 Benning.  In the process, he raises his firearm and fires three (3) shots at Officer E.D, as shown in the still from Exhibit 1 below (where Officer E.D. is visible above the yellow arrow). Ex. 1 at 3:29 – 3:35; Ex. 5 at :00 - :12; Ex. 7 at 2:19 – 2:25.



---

locate, and alert law enforcement agencies of gunfire.

[2] A copy of officer E.D.'s body worn camera has been submitted to the Court and Mr. Evans as Exhibit 7.

[3] While Mr. Evans' statements cannot be made out on body-worn camera, Officer E.D. stated he believed this is what Mr. Evans yelled at him.

Officer E.D. lowers himself to the ground and attempts to take cover behind a steel fence and parked vehicles before pointing his service pistol at Mr. Evans and discharging two (2) rounds. Ex. 7 at 2:25 – 2:30. Notably, Officer E.D. does not appear to raise his service pistol towards Mr. Evans until after Mr. Evans fires the first shots.  Ex. 2B at :25 - :37.

While retreating and shooting, Mr. Evans falls briefly on the wheelchair access ramp to 1711 Benning.  When he rises, he uses both hands to grasp his pistol in a firing position and fires his second volley of nine (9) shots at Officer E.D. while moving into 1711 Benning, as shown in the still below from Exhibit 4. Ex. 5 at :10 - :19; Ex. 4 at :04 - :14; Ex. 7 at 2:20 – 2:29. Officer E.D. returns fire with three (3) shots. Ex. 7 at 2:29 – 2:34.



Surveillance video does not capture the upstairs area of 1711 Benning; however, a third volley of two (2) additional shots are heard on Officer E.D.'s body worn camera as he continues to take cover behind the steel fence. Ex. 7 at 2:30 – 2:40.

Numerous casings and bullets were recovered from 1711 Benning, but two are of note. There are two casings on the stairs from the second floor to the third floor of the building, as shown in the photos below. This is important for two reasons. First, it shows that the defendant continued to fire after he went inside the building and was completely sheltered from any reasonably

objective, or, indeed, subjective, fear of harm. Second, the view associated along with the bullet shows the mortal danger Officer E.D. was in. Simply put, the defendant had the high ground and could shoot down at Officer E.D. In the figure below, the approximate location of where Officer E.D. was located is marked in red.



After Mr. Evans' third volley, Officer E.D. discharges an additional two (2) shots at Mr. Evans before retreating from the steel fence to a vehicle. *Id.* 2:50 – 2:55.

An officer riding a MPD motorcycle is the first on the scene to provide assistance. As this officer approaches, Officer E.D. directs him to immediately stop moving and to take cover behind the vehicle with him. Ex. 7 3:15 – 3:25. Officer E.D. then moves towards the Courtyard and calls out information to supporting MPD officers as to the location of Mr. Evans and how to stay out of Mr. Evans' line of gunfire. *Id.* at 4:30 – 6:00 (Officer E.D. is heard stating, for example: "he's right here on the top floor, I think he's wounded. He's sitting down . . ." and "back up! He has higher ground on ya'll!"). During this period of time, Officer E.D. maintains his line of sight on

Mr. Evans until an MPD tactical team enters 1711 Benning and places Mr. Evans under arrest. *Id.*
6:00 – 9:30; *see generally*, Ex. 8. Officer E.D., overcome with emotion, is heard screaming while
his fellow officers embrace him: "this [expletive] shot at me dog . . . [screams]." *Id.* at 9:29 - 9:50.

When members of MPD's tactical team made entry into 1711 Benning, Mr. Evans is seen
sitting on the top floor shirtless with the firearm discarded to his left. The firearm was determined
to be a Springfield XD 9x19 pistol that was reported stolen out of the state of Texas on March 9,
2023. The firearm was equipped with a sixteen (16) round magazine, which was empty at the time
of recovery. Pursuant to Mr. Evans' guilty plea (which is consistent with the exhibits submitted
to the Court and Mr. Evans), he admitted he fired fourteen (14) rounds at Officer E.D. and three
(3) shots in the air, meaning the firearm was fully loaded with sixteen (16) rounds in the magazine
and one (1) round in the Chamber when he first exited 1711 Benning. A screenshot of Exhibit 8
below shows the location of the firearm in relation to Mr. Evans at the time it was recovered:



## DISCUSSION AND RECOMMENDATION

### I.   Generally Applicable Legal Principles

Though the Sentencing Guidelines are advisory, *United States v. Booker* provides that
sentencing courts "must consult those Guidelines and take them into account when sentencing."

543 U.S. 220, 264 (2005); *United States v. Brown*, 892 F.3d 385, 399 (D.C. Cir. 2018). The

Supreme Court has noted that the Guidelines provide "the starting point and the initial benchmark"

for sentencing. *Gall v. United States*, 590 U.S. 38, 49 (2007); *see also United States v. Dorcely*,

454 F.3d 366, 375 (D.C. Cir. 2006) ("*Booker* has not changed how the Guidelines range is to be

calculated."). Moreover, the Guidelines' recommended sentencing range will ordinarily "reflect a

rough approximation of sentences that might achieve § 3553(a)'s objectives." *Kimbrough v.*

*United States*, 552 U.S. 85, 108-09 (2007); *Dorcely*, 454 F.3d at 376 (noting that "a sentence within

a properly calculated Guidelines range is entitled to a rebuttable presumption of reasonableness").

To calculate a Guidelines sentence, a district court must first select the applicable offense

guideline and then select the base offense level within that applicable offense guideline. *United*

*States v. Flores*, 912 F.3d 613, 616 (D.C. Cir. 2019). As the D.C. Circuit has long held, this inquiry

must include an evaluation of all relevant conduct that could affect the Guidelines calculation. As

noted:

> In the post-*Booker* world, the court must calculate and consider
> the applicable Guidelines range but is not bound by it. Under the
> Guidelines, "the sentencing range for a particular offense is
> determined on the basis of all 'relevant conduct' in which the
> defendant was engaged and not just with regard to the conduct
> underlying the offense of conviction." *Witte v. United States*, 515
> U.S. 389, 393 (1995) (citing U.S.S.G. § 1B1.3). Section 1B1.3
> details the conduct the sentencing court may consider in
> determining the applicable Guidelines range and the commentary
> to that section states, "Conduct that is not formally charged or is
> not an element of the offense of conviction may enter into the
> determination of the applicable guideline sentencing range."
> U.S.S.G. § 1B1.3, Commentary, Background

## II.   Defendant's Sentencing Guidelines Calculation

### A.  Defendant's Criminal History Category

The Government concurs with the United States Probation's assessment of the Defendant's

criminal history scores, as set forth in the Presentence Investigation Report ("PSIR"). ECF No. 33. The total criminal history score for his federal guidelines is two (2), and therefore establishes a criminal history category of II. *See* PSIR at ¶ 44. The Government also concurs with the PSIR assessment of his criminal history score under the D.C. Sentencing Guidelines. The total criminal history score for his D.C. guidelines is 1/4, which establishes a Criminal History Score of A. *See, id.* at ¶ 46.

**B. Total Offense Level**

The Government also concurs with the United States Probation's assessment of the Offense Level Computation set forth in the PSIR. *See* PSR at ¶ 36.

Accordingly, the federal guidelines range for Count One is 121 months to 151 months of incarceration, and the DC guidelines range for Count Four is 36 to 84 months of incarceration. At the time of the plea hearing, the parties incorrectly estimated Mr. Evans' Federal Guidelines Range to be 108 months to 135 months. *See* ECF No. 26 at ¶ 5D. The government also agreed to allocate for the top of the federal guidelines range, and for both counts to run concurrent to each other. *Id.* at ¶7.

**III.    <u>Sentencing Recommendation</u>**

When determining the appropriate sentence, the district court should consider all the applicable factors set forth in 18 U.S.C. § 3553(a). *See United States v. Gall*, 552 U.S. 38, 49-50 (2007). That Section provides that the Court consider the following: (A) "the nature and circumstances of the offense," 18 U.S.C. § 3553(a)(1); (B) "the history and characteristics of the defendant," *id*.; (C) general and specific "deterrence," 18 U.S.C. § 3553(a)(2)(B); (D) the need "to protect the public from further crimes of the defendant," 18 U.S.C. § 3553(a)(2)(C); (E) the need "to provide the defendant with needed educational or vocational training, medical care, or other

correctional treatment in the most effective manner," 18 U.S.C. § 3553(a)(2)(D); and (F) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." § 3553(a)(6).

## A.  The History and Characteristics of the Defendant

This Court's analysis of the appropriate sentence should begin at Mr. Evans' exceptional criminal history. Since Mr. Evans turned eighteen, he has spent a majority of his adult life incarcerated. In the few times where Mr. Evans has been on release in the past twenty years, he has continued to possess and use firearms.  Indeed, Mr. Evans was being supervised for his firearm conviction in 2016 CF1 20268 at the time he shot at Officer E.D. in this case. He now comes before the Court two days after his thirty-eighth birthday for a similar offense.

Mr. Evans has been arrested three times for murder, and of those, he has been acquitted twice at trial – once before the District of Columbia Superior Court, and once before the United States District Court for the District of Columbia.  *See* PSIR at ¶¶ 56, 60.  And despite his various murder and firearm arrests (of which this case represents his *eighth* firearm arrest), Mr. Evans comes before the Court with a Criminal History Category of II due to the time he served in a 2014 traffic matter and the D.C. Court of Appeals' ("D.C.C.A.")  reversal of his conviction in 2016 CF1 20268. *See id.* at ¶ 43; *Evans v. United States*, 304 A.3d 211 (D.C. 2023) (reversing his firearm conviction after finding that Mr. Evans was not liable for possessing and discharging a firearm since there was evidence at trial that Mr. Evans possessed and discharged that firearm in self-defense. As discussed below, there is no dispute that Mr. Evans possessed the firearm and discharged it).

At the outset, the United States does not seek to use the sentencing before this Court as an avenue to prove prior murders or firearms cases; however, an understanding of Mr. Evans'

reversed conviction in 2016 CF1 20268 is important to show the history and characteristics of Mr. Evans. At sentencing in that matter in 2019, a Community Supervision Officer with the Superior Court branch of the Court Services and Offender Supervision Agency ("CSOSA") aptly wrote this of Mr. Evans in the presentence investigation report:[4]

> The Court has before it a man that is not new to the courts. He fails to display any level of restraint or consideration for the Court, the law or the well-being of others. He wreaks havoc and invokes fear in the community and his antiauthority behavior conveys that he is an extremely high risk to the community. He has a very high propensity of creating a new victim. The defendant has experienced incarceration, yet he continues to disobey the law and incarceration is not a deterrent. The defendant has yet to show any improvement with rehabilitation, therefore incarceration appears warranted due to his continued violent criminal history. The defendant has seven gun arrests as well as three murder arrests. He has been acquitted from all three murder offenses including one attached to the instant offense. Yet, he still continues to possess firearms that may inevitably lead to the defendant being the person to eventually take someone's life. The defendant has been afforded probation supervision, which he was in non-compliant although he successfully completed them. He conveys a criminal mindset that says he has no intention of becoming a productive citizen.

The facts of 2016 CF1 20268 were largely undisputed at trial due to video evidence showing Mr. Evans possessing a firearm and shooting. *See Evans* 304 A.3d at 216. As such, the below summary of facts was provided by the D.C.C.A. in their opinion reversing Mr. Evans' conviction:

> [On November 25, 2016] Saeve Evans met up with his friends, Breyona McMillian and Tajma Dockery, in the outdoor area of the Potomac Gardens apartment complex. The three smoked a joint while standing between a blue dumpster and a yellow donation bin right next to the complex's parking lot. Once the trio finished the joint, Dockery—who was 16 years old—walked into the parking lot where a friend was waiting to pick her up. A black Nissan then pulled into the parking lot and went straight toward Evans and McMillian. The car "broadsided" with its rear windows rolled down, as if to give those on the passenger's side a direct line of sight to Evans. Multiple shots then rang out, and it seems that some were fired by the occupants of the car and some by Evans. One of the shots struck McMillian in her head and killed her, though it was unclear who fired it. The black Nissan then backed

---

[4] The underlying presentence investigation report was provided to Mr. Evans May 6, 2024.

out of the parking lot and drove off, and was later abandoned nearby; it was outfitted with counterfeit plates. Neither Evans nor any of the car's occupants called 911 to report the shooting.

\* \* \*

Three surveillance video cameras captured the events in Potomac Gardens from different angles. One camera showed the black Nissan entering the parking lot, driving toward Evans and McMillian with its rear windows down, and then broadsiding and pausing for a second or two. The car then promptly went into reverse and backed out the entire length of the parking lot within a few seconds. The other two cameras show the area behind the blue dumpster. At some point after the shooting started, the footage shows Evans walking backward, pointing and seemingly firing a gun toward the parking lot, and then removing the magazine from the gun and running away, carrying the gun and magazine with him. While it is difficult to pinpoint just how long after the shooting ended that Evans can be seen still in possession of the weapon, it was about three seconds, or roughly the same amount of time it took the black Nissan to back out of the parking lot.

Sixteen cartridge casings were found on the scene, mostly concentrated around where Evans was standing.

*Id.* at 215.

Mr. Evans was charged with, amongst other things, first and second-degree murder while armed and unlawful possession of a firearm by a person previously convicted of a crime punishable by a term of imprisonment for a term exceeding one year ("FIP"). *Evans*, 304 A. 3d at 216. At trial, Mr. Evans contended that he shot at the Nissan in an act of self-defense while the Government argued that Mr. Evans was high and paranoid and shot at the black Nissan unprovoked, and furthermore that a bullet from Mr. Evans' firearm killed the decedent. At the conclusion of trial, the jury acquitted Mr. Evans of all charges but the FIP charge. As noted by the D.C.C.A.: "[t]here is no question, given the various acquittals, that the jury concluded that Evans was acting in self-defense when he shot at the black Nissan, or at least that it could not find to the contrary beyond a reasonable doubt." *Id.* at 231. The D.C.C.A. then went on to reverse Mr. Evans' FIP conviction, holding that "[t]he otherwise illegal possession of a firearm may be justified, so as to not be

criminal, if the weapon is held in lawful self-defense" and that a defendant may do so for "a short period after the person realizes the threat has subsided, so that they have a reasonable opportunity to promptly dispossess themselves of the weapon." *Id.* at 213-14. Because there was "virtually no evidence that Evans continued possessing the firearm beyond the few seconds as he fled from the scene in the shooting's immediate aftermath," the D.C.C.A. reversed Mr. Evans' FIP conviction, holding that the trial court's failure to properly instruct the jury that Mr. Evans had a "reasonable opportunity to promptly dispossess themselves of the weapon" was harmful and mandated reversal. *Id.* at 230-31.

His conduct in 2016 CF1 20268 is highlighted in this memorandum as Mr. Evans, himself being a victim of gun violence in 2012, has been through multiple experiences such that he is acutely aware as to the dangers involved with firearms and their aftermath. PSIR at ¶ 80.[5] Yet, Mr. Evans continues to possess firearms even while engaging in activities as commonplace as walking his dog in the early morning. Of course, his behavior in this case underscores just how willing he is to use that illegal firearm both to frighten strangers who have the misfortune of walking by and to shoot at officers simply doing their jobs. His history and characteristics, unfortunately, show that Mr. Evans has not made steps to change his behavior and is ready, willing, and able to use firearms at a moment's notice.

Several mitigating factors about Mr. Evans' history have been brought to the government's attention throughout the pendency of the case before this Court. ████████████████

---

[5] While Mr. Evans claims (and has claimed previously) that no one was ever prosecuted for the 2012 shooting where he was a victim, this is incorrect. Javon Hale and Sean Schuler were both prosecuted in D.C. Superior Court case numbers and 2013 CF3 1528 and 2014 CF1 16857, respectively, despite Mr. Evans' refusal to participate in either prosecution. In those factual proffers, both Mr. Hale and Mr. Schuler admitted to approaching Mr. Evans while he was in a vehicle and firing over twenty shots at him with the intent to kill him.



See Ex. 9; PSIR ¶ 84a. Moreover, Mr. Evans described a difficult and tumultuous upbringing that required him to carry a firearm beginning at nine (9) years old and that his experience dealing crack cocaine and marijuana was because "it's all you see growing up. That's all I knew how to do." Ex. 9 at p. 2. While the United States does not dispute ████████████████████████████████████████████████████████, it does address a number of inconsistencies with Mr. Evans' prior cases.

In the first presentence report ever prepared for Mr. Evans pursuant to his sentencing in 2005 FEL 3797 (the "2006 PSIR"),[7] a copy of which has been submitted to the Court as Exhibit 10, a CSOSA Officer wrote in 2006 that Mr. Evans' home with his mother "was clean and appeared to be conducive for rehabilitation" with "no weapons or drugs" evident in the home." Ex. 10 at p. 10. Furthermore, this officer noted that Mr. Evans "describes his childhood years as having been very pleasant. He reports participating in organized sports in the community such as football, basketball and soccer.  No incidents or abuse or neglect are claimed and neither parent is described as an illegal drug user." Id. With respect to drug usage, Mr. Evans by his own admission stated he began to use marijuana at age sixteen (16), followed by Phencyclidine ("PCP").  However, "all drug use reportedly ended after a short period of drug treatment" and Mr. Evans "does not feel he is in need of substance abuse counseling." Id. at p. 11.

Mr. Evans echoed these same statements again in 2019 in preparation for his sentencing in

---

[6] ████████████████████████████████████████████████

[7] The Presentence Investigation Report for 2005 FEL 3797 was provided to Mr. Evans on May 6, 2024.

2016 CF1 2026 (the "2019 PSIR"), a copy of which has been submitted to the Court as <u>Exhibit</u> <u>11</u>.[8] As noted in the 2019 PSIR, Mr. Evans described his childhood neighborhood as "cool" to him, but "bad to others since it is the ghetto." Ex. 11 at p. 19. This CSOSA Officer also noted that "there was no violence in his home, he did not suffer any abuse, and was well provided for" and that "his mother has never been arrested or used illegal drugs." *Id.* Mr. Evans himself reported that he began smoking marijuana around fourteen (14) years old and moved onto PCP, ecstasy, and promethazine cough syrup. Nevertheless, Mr. Evans claimed in 2019 that he "does not feel he can benefit from substance abuse treatment." *Id.* at p. 14. ▪▪▪▪▪▪

▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪

▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪

*Id.* Finally, this 2019 PSIR noted that Mr. Evans "appears to have partial remorse for the instant offense, as his only remorse was geared towards [Breyona McMillain] who was killed due to his actions and not the community as a whole or the people he was shooting at." *Id.* at p. 25.

Mr. Evans' history and characteristics undoubtedly reflect a complicated individual, albeit one that has consistently lacked the ability to accept responsibility for his actions and the will to change. Unfortunately, Mr. Evans' history shows a dangerous combination of consistent access to firearms, violence, and unwillingness to receive treatment for drug ▪▪▪▪▪▪ issues. For these reasons, Mr. Evans' history and characteristics strongly support a lengthy period of incarceration and supervised release.

**B. Nature and Circumstances of the Offense**

The August 1, 2023 shooting cannot be understated in terms of its dangerousness to the public. It was, from an objective point of view, a completely random and unprovoked shooting

---

[8] The Presentence Investigation Report for 2016 CF1 2026 was provided to Mr. Evans on May 6, 2024.

where Mr. Evans unloaded seventeen (17) rounds in a highly populated residential neighborhood. Mr. Evans could have killed multiple people due to his actions, whether it be the Unidentified Individual, Officer E.D., or any of the numerous individuals walking on the sidewalk or driving by during Mr. Evans' violent shooting.  It is, in other words, pure luck that Mr. Evans did not harm or kill anyone on August 1, 2023, as his firearm was clearly pointed directly at Officer E.D. with numerous residences on Gales Place Northeast behind the officer.

Mr. Evans also fired three (3) separate volleys at Officer E.D. during the shooting. After the first completely unprovoked volley of three (3) shots at Officer E.D., Mr. Evans repositioned himself by the entrance to 1711 Benning and fired nine (9) shots at Officer E.D. while moving into 1711 Benning. Ex. 5 at :10 - :19; Ex. 4 at :04 - :14; Ex. 7 at 2:20 – 2:29. Then, Mr. Evans retreated upstairs to safety, gained a tactical advantage over Officer E.D., and fired two (2) more shots at Officer E.D. through the second-floor landing. Ex. 7 at 2:30 – 2:40. The trauma Mr. Evans caused to Officer E.D. alone (not to mention Mr. Evans' neighbors who undoubtedly live in fear of another shooting because of his actions) is clearly demonstrated on Officer E.D.'s body-worn camera as he screams out after Mr. Evans is detained. While Officer E.D. has been contacted and does not wish to make a statement at sentencing, he wished to convey to the Court that his primary concern that day was that there could have been children or other civilians outside as Mr. Evans attempted to shoot him.

The extreme risk that Mr. Evans created on August 1, 2023, strongly supports a lengthy period of incarceration and supervised release.

## C. The Need to Avoid Unwarranted Sentencing Disparities

As noted in the PSIR, the sentence proposed by the government is above the average and median for nine (9) other individuals with a final offense level of 31 and a criminal history category

of II. PSIR at ¶ 157. However, as discussed above, both Mr. Evans' history and characteristics, as well as the nature of the offense he committed in this case, are exceptional in terms of dangerousness and his likelihood of re-offending.  For these reasons, a sentence above the average and median is warranted in this case.

### D.  General and Specific Deterrence

Imposition of a significant sentence is necessary to provide for both general and specific deterrence. "Under the theory of general deterrence, the government essentially seeks to make an example of an offender through punishing him so that other potential offenders are intimidated into refraining from committing the contemplated crime." *United States v. Slatten*, 865 F.3d 767, 819 (D.C. Cir. 2017) (noting that "harsh sentences" "generally operate as strong deterrents"); *United States v. Diaz-Navarro*, 567 F. App'x 256, 257 (5th Cir. 2014) (since defendant had committed offense before and received a light sentence a "'long incarceration period'" was necessary for deterrence); *United States v. Rivera*, 488 F. App'x 225, 227 (9th Cir. 2012) (harsh sentence necessary for deterrence in light of defendant's recidivism).

Mr. Evans' shooting occurred in the middle of the deadliest year in the District of Columbia since 1997, giving our jurisdiction the fifth-highest murder rate amongst the nation's biggest cities. Of the 274 murders that occurred in 2023, *ninety percent* of those were committed with guns. *See*, Emily Davis *et. al.*, *2023 was District's Deadliest Year in More than Two Decades*, Wash. Post (Jan. 1, 2024, 12:00 p.m.), https://www.washingtonpost.com/dc-md-va/interactive/2024/dc-crime-homicide-victims-shooting-violence/ (last visited May 15, 2024). The gun violence epidemic this jurisdiction faces is caused by individuals like Mr. Evans who carry no regard for laws that prevent him from possessing and using firearms. *See Gall*, 552 U.S. at 54 (recognizing that "a lenient sentence for a serious offense threatens to promote disrespect for the law"). A significant period

of incarceration is necessary to demonstrate to the general public that such brazen and dangerous behavior – the act of shooting at two different individuals while in the middle of a residential neighborhood – cannot be tolerated and will be met with swift and serious punishment.

A significant period of incarceration is also necessary for specific deterrence. Over the past decade, Mr. Evans has faced two murder cases at trial and was incarcerated beginning on December 12, 2016, until he was acquitted in this very courthouse on November 11, 2022, just nine months before the shooting before this Court. *See United States v. Saeve Evans*, 22-CR-63 (RCL) (D.D.C.). After standing trial twice, both times with a potential maximum punishment of life imprisonment, Mr. Evans was released and promptly obtained (and used) yet another illegal firearm. It is clear that the threat of imprisonment has, as of yet, had no deterrent effect on his criminality. Accordingly, a significant period of incarceration and supervised release is necessary here to deter Mr. Evans from gaining of control of another firearm upon his release.

**E. The Need to Provide the Defendant with Treatment in the Most Effective Manner**

As Mr. Evans has demonstrated a past unwillingness to seek assistance for his drug abuse

████████████████ issues, ████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████  Furthermore, Mr. Evans is actively

receiving suboxone as a result of the DC Jail's diagnosis of his opioid abuse problem. *Id.* at ¶88a.

Mr. Evans has shown a lack of ability or desire to seek the appropriate ███████████

drug treatment for problems he has been experiencing since his youth. There is no reason to believe

that he would suddenly, at the age of 38 years old, █████████████████████████

██████████████  addressing his drug abuse problems should he be released. ███████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████  As such, a lengthy period of incarceration is demonstrably the most effective

way to provide Mr. Evans with the appropriate drug and mental health treatment.

**F.  The Need to Protect the Public from Further Crimes of the Defendant**

The need for a lengthy period of incarceration is a matter of public safety. ███████████

████████████████████████████████████████████████████  Mr. Evans

has demonstrated his ability to possess firearms and his willingness to use them in ways that

present grave risks to innocent bystanders. ██████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████  This, in combination with Mr. Evans' self-

stated history of firearm possession and refusals to engage in drug and mental health treatment

creates an untenable situation where law enforcement is simply waiting to hear of Mr. Evans' next

victim. ████████████████████████████████████████████████████████

████████████████████████████████████

       For the reasons stated, the United States requests this Court sentence Mr. Saeve Evans on Count One (Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by a Term of Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. § 922(g)(1)) to a period of one hundred and thirty-five (135) months of incarceration followed by five (5) years of supervised release, and Count Four (Assaulting a Police Officer While Armed, in violation of 22 D.C. Code §§ 405(c), 4502) to a period of eighty-four (84) months of incarceration followed by five (5) years of supervised release, to run concurrent with Count One.

                Respectfully submitted,

                MATTHEW M. GRAVES
                UNITED STATES ATTORNEY
                D.C. Bar No. 481052

                */s/ Justin F. Song*
                Justin F. Song
                N.Y. Bar No. 5626379
                Assistant United States Attorney
                601 D Street N.W.
                Washington, D.C. 20530
                202-227-9109
                Justin.Song@usdoj.gov